**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

DR. WILLIAM S. HUSEL, M.O.

      Plaintiff,

      – against –

TRINITY ASSURANCE LTD. (CAYMAN)
and TRINITY HEALTH CORPORATION,

      Defendants.

Case No.: 19-CV-12478

<u>**COMPLAINT**</u>

    Plaintiff Dr. William S. Husel ("Dr. Husel"), by his undersigned counsel, allege as follows against defendants Trinity Assurance Ltd. (Cayman) and Trinity Health Corporation.

**NATURE OF THE ACTION**

    1.    This is an action brought by an insured against an insurer, and the "first named insured" under certain applicable policies of insurance to enforce the obligation to defend, and in connection with such defense, advance to the costs and fees of Dr. Husel's selected counsel on an ongoing basis, and to reimburse him for fees for services already provided in his defense.

    2.    Under the four insurance policies at issue here, the obligation to defend is delegated from the insurer – defendant Trinity Assurance Limited (Cayman) ("TAL") – to the first named insured – defendant Trinity Health Corporation ("THC"). TAL is a captive insurer of THC.

    3.    Though the duty to defend is delegated from TAL to THC (TAL is obligated to indemnify THC for advancing fees and costs), it is TAL that considered and denied Dr. Husel's claim to advance and indemnify the costs of a defense in a criminal matter, even though, subject

to a reservation of rights, they have defended Dr. Husel in 36 separate and distinct civil proceedings arising from the same allegations. THC has therefore breached its duty to defend separate and apart from TAL's breaching its obligation to indemnify.

4.      TAL's determination not to advance the costs of Dr. Husel's defense, unless promptly remedied, will deprive Dr. Husel of the benefit of the the applicable insurance policies, which Dr. Husel bargained for and obtained as consideration in his employment agreement. His fully-signed employment agreement explicitly provides that THC would obtain Healthcare Liability Insurance on his behalf, and it did so.

5.      Absent the advancement of defense costs, Dr. Husel will not be able to defend himself and prove his innocence in the criminal case and his defense will be significantly less than he otherwise would be able to present than if THC and TAL complied with the obligations under the applicable insurance policies. It is possible that Dr. Husel, a man who is entirely innocent of any criminal (or civil) wrongdoing, can be convicted because his employer and its captive insurance company are wrongfully refusing to abide by the "duty to defend" obligations in the applicable insurance policies, and refusing without any good-faith basis to advance his defense costs at the most critical time of the criminal proceeding: now.

## PARTIES

6.      Plaintiff Dr. William S. Husel, D.O. is a resident of the State of Ohio.

7.      During the relevant period, Dr. Husel was employed as an attending physician in the intensive care unit of non-party Mount Carmel Health System, a non-party hospital that is wholly owned and controlled by defendant THC.

8.      Defendant THC is an Indiana corporation with a principal place of business located at 20555 Victor Parkway, Livonia, Michigan.

9.      Defendant TAL is a limited liability company established under the laws of the Cayman Islands.  TAL is a "captive" insurer for THC.  THC owns and controls TAL.  TAL provides insurance to THC, as well as THC's subsidiaries, affiliates, employees and employees of THC's subsidiaries and affiliates, including Dr. Husel.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the plaintiff is diverse from each defendant.

11.      This Court has general personal jurisdiction over THC because its principal place of business is located within the Eastern District of Michigan.

12.      This Court has general personal jurisdiction over TAL because it is a captive insurer of THC, and as such, its entire business is to service the insurance needs of THC.

13.      The Court has specific jurisdiction over TAL because the policies of insurance at issue here were provided to the Michigan-based defendant THC and because, on information and belief, all decisions regarding coverage were made by TAL's authorized agents located in Livonia, Michigan.

14.      Plaintiff seeks incurred damages of no less than $75,000, satisfying the amount-in-controversy requirement of 28 U.S.C. § 1332(a), and a declaration to prevent further damages.

15.      Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred herein.

## STATEMENT OF FACTS

### *Dr. Husel's Employment at Mount Carmel*

16.      Dr. William S. Husel, M.O. was employed as a doctor who worked in the Intensive Care Unit ("ICU") at Ohio's Mount Carmel West hospital, a subsidiary of THC, from 2013 until December 2018.

17.     In connection with his professional responsibilities in the ICU, Dr. Husel was frequently the doctor tasked with prescribing pain medication to near-death patients who were being removed from life support.

18.     In carrying out this responsibility, Dr. Husel often prescribed pain medication to patients, including morphine, fentanyl, Versed, and Dilaudid.

19.     All of these medications are commonly prescribed narcotics and sedatives used to make patients feel relaxed or sleepy, and are indicated to treat severe pain felt during the process of dying.

20.     As part of his fully signed employment agreement, Dr. William Husel was guaranteed that his employer would provide him with "professional liability insurance for all activities conducted in the course of employment" at Mount Carmel Hospital in Columbus, Ohio. (A true and correct copy of Dr. Husel's Employment Agreement is attached hereto as Exhibit 1.)

21.     Mount Carmel Hospital is a subsidiary of THC; as such, THC was the entity that purchased the "professional liability insurance" on behalf of the hospital and Dr. Husel.

22.     The professional liability insurance that THC obtained in satisfaction of this agreement explicitly provides, among other things, that it would cover "Defense Expenses incurred in connection with a claim arising from Healthcare Professional Liability . . . even if any of the allegations of the claim are groundless, false, or fraudulent."

23.     In compliance with these obligations, each year, THC obtained the promised insurance policy, issued by TAL.  In fact, THC obtained four separate insurance policies, each from TAL, providing four layers of coverage.

24.     In compliance with these obligations, THC obtained the Integrated Risk Liability Policy, Policy No. V-18/19-INTPR-1001 (the "Primary Policy") which covered Dr. Husel as an

employee of one of THC's subsidiary hospitals.  (A true and correct copy of the Primary Policy

is attached as Exhibit 2.)

25.     In compliance with these obligations, THC obtained the Follow Form Buffer

Layer Liability Policy, Policy Nov-19/19-HP-BUF (the "Buffer Policy") which covered Dr.

Husel as an employee of one of THC's subsidiary hospitals.  (A true and correct copy of the

Buffer Policy is attached as Exhibit 3.)

26.     In compliance with these obligations, THC obtained the Excess Integrated Risk

Liability Policy, Policy No. VXSR-18/19-1 (the "Excess Policy") which covered Dr. Husel as an

employee of one of THC's subsidiary hospitals.  (A true and correct copy of the Excess Policy is

attached as Exhibit 4.)

27.     In compliance with these obligations, THC obtained the Follow Form High

Excess Layer Policy, Policy No. V-XSPLGL-18/19 (the High Excess Policy"), in effect from

July 1, 2018 to July 1, 2019, which covered Dr. Husel as an employee of one of THC's

subsidiary hospitals.  (A true and correct copy of the High Excess Policy is attached as Exhibit

5.)

28.     In the indictment dated June 5, 2019 (the "Indictment") Dr. Husel is accused of

"purposely caus[ing] the death of twenty-five individuals between February 10, 2015 and

November 2018.  (A true and correct copy of the complaint is attached hereto as Exhibit 6).

29.     The Indictment does not indicate any theory of motive.  During a press

conference, the local prosecutor acknowledged that there was no evidence of any motive.

30.     All 25 individuals whose deaths are at issue in the Indictment were terminally ill

and had been, or were in the process of, having life support terminated at the time Dr. Husel is

alleged to have prescribed too much pain relief medication.

31.     In each case, Dr. Husel's medical responsibility included selecting pain medication or medications and dosage(s) to treat the anticipated pain each patient was expected to experience in the period between the removal of life support and death.

32.     The Columbus Dispatch reviewed the medical records of the individuals who Dr. Husel is accused of purposely ending the life of, and published descriptions, among others:

Rebecca Walls, 75, of the South Side arrived at the hospital on Nov. 13, 2018 with increased difficulty breathing. She developed a blood clot and was transferred to the ICU. The doctor talked to the family on Nov. 19 and they agreed to provide comfort care. She was given 1,000 micrograms of fentanyl and 10 mg of Versed at 1:26 a.m., and died six minutes later.

Melissa Penix, 82, of Grove City arrived at the hospital with difficulty breathing on Nov. 15, 2018 and was transferred to the ICU for further monitoring. Her family asked that the ventilator be removed. She was given 2,000 micrograms of fentanyl and 10 mg of Versed at 10:48 and 10:40 p.m., respectively, and died at 10:53.

James Allen, 80, of Franklinton, was taken to the hospital on May 24, 2018 because of septic shock and was transferred to the ICU on May 28. He was given 1,000 micrograms of fentanyl and 6 mg of Versed at 11:20 p.m. on May 28, and died 20 minutes later.

Emma Bogan, 75, of the Far West Side was taken to the hospital on Feb. 10 with septic shock. Medical records indicate that a doctor explained the grave situation to the family and they decided to take her off the ventilator.  She died at 1:07 a.m. on Feb. 11, 2015, two minutes after she was given 400 micrograms of fentanyl and 4 micrograms of Versed.

Jan Marlene Thomas, 65, of the Far West Side was brought to the hospital in respiratory arrest on Feb. 28, 2015 and was diagnosed with multi-embolic stroke. Medical records indicate her family has asked that she be removed from the ventilator. She was given 800 micrograms of fentanyl at 12:11 a.m. on March 1 and died at 12:42 a.m.

Joanne S. Bellisari, 69, of the West Side. She arrived at the hospital April 22, 2015 after a seizure. The family decided to withdraw care on May 10, medical records indicate. She was given 1,000 micrograms of fentanyl at 11:32 p.m. on May 10 and died eight minutes later.

Michael Walters, 57, arrived at the hospital on Oct. 6, 2017 with acute brain swelling and respiratory failure. The family was encouraged to change his status to do not resuscitate, and agreed. He was given 500 micrograms of fentanyl at 4:11 a.m. on Oct. 11, and died eight minutes later.

Larry Brigner, 70, of the South Side arrived at the hospital on Dec. 10, 2017 due to an altered mental state related to a history of cancer. A doctor's note said he discussed Brigner's grim prognosis, and the family decided to withdraw care. He was given 500 micrograms of fentanyl and 4 mg of Versed at 10:36 p.m., and died 5 minutes later.

(A true and correct copy of the Columbus dispatch article is attached as Exhibit 7.)

33.     None of these patients' family members or loved ones had any reason to suspect that the patient had received anything other than the appropriate palliative medical and comfort care at the end of their lives, given their decision to withdraw life support.

### *December 2018 – Mount Carmel Contacts Families of Deceased Patients to Allege that Dr. Husel Prescribed End-of-Life Pain Medication that Hastened Death; Families Sue as a Result*

34.     In October 2018, the hospital received an internal complaint from a pharmacist questioning whether the hospital had any policies or procedures regarding the proper dosage of pain medication during end of life care. This inquiry did not suggest there was any cause for alarm or any wrongdoing by Dr. Husel; it was merely a question. The hospital did not take any action in response to this initial "complaint."

35.     The hospital did not have any policies or procedures with respect to proper dosage of any pain medication during the withdrawal of ventilator and other forms of life support. Each doctor was expected to prescribe appropriate medication based on their own training and experience.

36.     The hospital received a second internal complaint from a pharmacist questioning the proper dosage of pain medication during end-of-life treatment that Dr. Husel was prescribing, pharmacists were approving, and nurses were administering, prompting the hospital to initiate an "internal investigation" which lasted no more than a few weeks. Following this inquiry, and prior to any patient or family member accusing the hospital of any wrongdoing, the hospital went to the state prosecutor's office to report that their inquiry had found that Dr. Husel was prescribing pain medication to dying patients in amounts that they believed "hastened" patients' deaths. The hospital then began calling family members at the end of December 2018 to report the same findings.

37.     In these unsolicited calls, representatives of the hospital informed family members of the deceased patients that the patients were each "given an excessive dose of fentanyl by Defendants which hastened and/or caused [] death."   (True and correct copies of 4 selected complaints brought by the estates of deceased patients are attached hereto as Exhibit 8 as a composite exhibit).

38.     Many family members were told to expect a call from a detective who was investigating the matter.  (Ex. 8)

39.     Two weeks later, the hospital made another round of calls to family members of 35 patients who had died in the hospital to inform them that "the actions [were] not an isolated event, but rather a repeated course of conduct by [Dr. Husel, pharmacists, and nurses] with respect to at least 26 other patients at Mount Carmel" and that "multiple physicians, nurses, and pharmacists been fired based on this conduct."  (Ex. 8)

40.     Following, and as a result of, the hospital's unsolicited outreach to the decedents' families and accusations that Dr. Husel had hastened his patients' deaths, the first of many civil lawsuits was filed on January 14, 2019.  Since that date, an additional 35 lawsuits have been filed against the hospital, Dr. Husel, and dozens of pharmacists and nurses each alleging that Dr. Husel and other defendants *intended* to hasten the death of the patient.

41.     As of January 29, 2019, four civil lawsuits against the hospital, Dr. Husel, and several pharmacists and nurses had been filed.

42.     The complaints in each of the first four cases allege that on four separate occasions, at different times and with different alleged co-defendants, a patient was prescribed pain relief medication by Dr. Husel, that was "reviewed and approved by Mount Carmel's pharmacist [] and the medication was made available to the patient's nurse."

43.    The first four civil complaints allege that the pharmacist knew that the dosage of the pain medication was "grossly inappropriate, serviced no therapeutic purpose or function, and would only serve to hasten the termination of the patient's life."

44.    These complaints each alleged that the nurse "administered the lethal dosage" "with full knowledge that such a grossly inappropriate dose of fentanyl would hasten the termination of [the patient's] life.

45.    Each of these four complaints also alleged that "Plaintiff received a call from a physician-administrator affiliated with Mount Carmel.  That administrator informed Plaintiff that her [family member] was given an excessive dosage of fentanyl by Defendants which hastened and/or caused [the patient's] premature death."

46.    In each case, the complaints allege that the administrator further informed Plaintiff that all individuals involved in the provision of the excessive dosage of fentanyl were suspended from patient care by Mount Carmel, as a result of, inter alia, the actions taken with regard to [the patient]."

47.    These four Complaints also each allege that the respective "Plaintiff[s] received yet another call from Mount Carmel administration on January 14, 2019 informing [them] that the actions described [in the Complaint] are not an isolated event, but rather a repeated course of conduct by Defendants with respect to at least 26 patients at Mount Carmel.  Further, multiple physicians, nurses, and pharmacists have been fired based on this conduct."

48.    The complaints each also alleged in words or effect that Defendant Dr. Husel, the nurses, and pharmacists were each employees of Mount Carmel at all times relevant, acting within the scope of their employment when they provided care and treatment to the patients, including the ordering, approval, and administration of fentanyl.

49.     Finally, the civil complaints each alleged that the conduct of defendants Dr. Husel, the nurses, and pharmacists "could only result from Mount Carmel's systemic deficiencies and practices, which Mount Carmel failed to remedy, and which resulted in significant harm (death) to at least 26 patients."

50.     At no time did the hospital have any policies or procedures regarding the proper amount of fentanyl or any other pain medication during ventilator withdrawal.  At no time did the hospital provide any training to any doctor in this regard.  At no time prior to firing Dr. Husel was he made aware that anyone believed the doses he was prescribing were excessive or in any way inappropriate.

51.     At all times Dr. Husel was intending to provide proper palliative care to his patients who were dying, while attempting to minimize pain and suffering experienced by the patient and their family members.

52.     Even assuming that the doses of pain medication that Dr. Husel prescribed, pharmacists approved, and nurses administered hastened the death of patients who received the medication while being taken off of life support, his conduct is shielded from prosecution under Supreme Court precedent in *Vacco v. Quill*, 521 U.S. 793 (1997), which recognized the "double-effect" of palliative care in which the prescription of medication for pain relief – *even when it hastens death* – is an acceptable form of care, providing doctors with necessary protections from undue litigation or even criminal prosecution in connection with the extremely sensitive and controversial delegation of providing compassionate care for patients as they die.

53.     Moreover, Ohio law provides immunity for doctors who prescribe pain medication that hastens a patient's death, if given as part of palliative care and the purpose of medication is to ease suffering.  Ohio Revised Code, Chapter 2133 Modified Uniform Rights of

the Terminally Ill Act and the DNR Identification and Do-Not Resuscitate Order Law, Section

2133: Immunities, grants immunity from criminal prosecution to doctors:

> "Prescribing… or causing to be administered by judicious titration or in another manner any form of medication, for the purpose of diminishing the … patient's pain or discomfort and not for the purpose of postponing or causing the qualified patient's or other patient's death, even though the medical procedure, treatment, intervention, ***or other measure may appear to hasten or increase the risk of the patient's death, if the attending physician so prescribing, dispensing, administering, or causing to be administered or the health care personnel acting under the direction of the attending physician so dispensing, administering, or causing to be administered are carrying out in good faith the responsibility to provide comfort care…***"

***Early 2019 – THC and TAL Comply with Their Obligation to Defend Dr. Husel Under the Contract of Insurance at Issue Here and Appoint Counsel***

54.     Having been put on notice of these civil claims against him alleging that he

intentionally caused the death of these four patients, Dr. Husel made a demand on TAL that his

defense fees and costs be advanced.

55.     TAL sent Dr. Husel and THC a Reservation of Rights letter dated January 29,

2019 (the "First ROR").  (A true and correct copy of the reservation of rights letter dated January

29, 2019 is attached as Exhibit 9.)

56.     The First ROR described the Policies, the terms of coverage and exclusions and

concluded that "until the veracity of the facts of the Claims is determined, it is unclear whether

Dr. Husel is insured by TAL for the Claims.  Accordingly, TAL reserves its rights and defenses

with respect to the Claims as it relates to coverage for Dr. Husel under the Policies."

57.     Because there was no determination as to the veracity of the facts of the Claims,

TAL agreed to indemnify THC for all of Dr. Husel's Defense Costs.

58.     Given this conclusion, and pursuant to Part VIIIA of the Primary Policy which

obligates THC to defend Dr. Husel, THC notified Dr. Husel that "Trinity Health Corporation

similarly reserves its rights under the same reservations as set forth in the [January 29, 2019] letter from the Insurance Company.  Trinity Health Corporation will provide you with a defense of the Claims pursuant to this reservation of rights.  We have hired Greg Foliano to defend you. Please provide this firm with your full cooperation."

59.     On or about April 15, 2019, TAL provided THC with a "Supplemental Reservation of Rights re: Dr. William Husel" to account for "multiple additional complaints as brought by an additional 26 claimants (the "Second ROR"). (A true and correct copy of the Second ROR is attached hereto as Exhibit 10.)

60.     As noted by the Second ROR, these additional 26 complaints largely mirrored the original four in that they "collectively allege that Dr. Husel, Mount Carmel and its medical staff prescribed, ordered, and administered lethal doses of fentanyl (or similar drugs) to be given to the Plaintiffs which subsequently caused their death while they were patients of Mount Carmel."

61.     In each case, "[t]he Plaintiffs allege that the Fentanyl doses were either ordered negligently and not properly reviewed, or were intentionally prescribed by Dr. Husel for the purpose of hastening the termination of Plaintiffs' lives."

62.     The Second ROR largely mirrored the First ROR, and concluded, once again that "until the veracity of the facts of the New Claims is determined, it is unclear whether Dr. Husel is insured by TAL for the New Claims."

63.     As such, Trinity Health, continued to provide a defense for Dr. Husel for each of these 26 civil claims, and to advance his defense costs.

***June 2019 – Dr. Husel Is Indicted for 25 Individual Counts of Murder, Ranging from February 2015 to November 2018, on the Theory that Dr. Husel's Issuance of Prescriptions for Pain Medication Constituted the "Purposeful" Cause of Death in Each Case***

64.     On June 5, Dr. Husel was indicted on 25 counts of murder in Franklin County, Ohio pursuant to section 2903.02 UF of the Ohio Revised Code.

65.     The Indictment provides no factual allegations whatsoever, except to state the date of each separate event, the name of the Mount Carmel patient who died in the hospital, and that the Grand Jury found that Dr. Husel "did purposely cause the death" of the patient.

66.     The Indictment does not allege, and the prosecutor has made no public statements explaining, why Dr. Husel, with the assistance of dozens of other hospital nurses and pharmacists, would intentionally cause the death of severely ill patients after their families had determined that care should be withdrawn and that they should be permitted to die in peace.  The prosecutor asserted in his press conference that they had no evidence of any motive behind the "purposeful murder" of patients who had been removed from life support upon the wishes of their family members (or legal surrogates).

***July 2019 -- Dr. Husel's Criminal Counsel Presents a Claim to TAL and THC for Coverage of Defense Fees and Costs***

67.     On July 8, 2019, counsel for Dr. Husel wrote to counsel for Trinity Health and Mount Carmel Hospital to demand coverage of his defense in the criminal action under the Policies.

68.     That day, counsel for Mount Carmel and Trinity Health acknowledged he had received the demand, that the demand had been forwarded to the insurance company and that the insurance company would be in touch. (A true and correct copy of the July 8, 2019 demand letter is attached hereto as Exhibit 11.)

69.     On April 15, 2019, TAL provided Trinity Health Corporation with a "Supplemental Reservation of Rights re: Dr. William Husel" to account for "multiple additional complaints as brought by an additional 26 claimants. These additional 26 complaints largely mirrored the original four complaints, and the April 15 reservation of rights letter largely mirrored the original letter, concluding once again that "until the veracity of the facts of the New

13

Claims is determined, it is unclear whether Dr. Husel is insured by TAL for the New Claims."

Because there was no basis on which to deny coverage for these claims, Trinity Health continued

to provide a defense for Dr. Husel for each of these 26 civil claims, and to advance his Defense

Expenses, and TAL continued to indemnify Trinity Health for all Defense Expenses Trinity

Health advanced, a determination which was transmitted to Dr. Husel on August 2, 2019.

70.     On August 5, 2019, TAL issued a "Second Supplemental Reservation of Rights"

letter.  (A true and correct copy of the Third ROR is attached hereto as Exhibit 12.)   The Third

ROR related only to Dr. Husel's continued defense in the civil actions. (the "Third ROR")

71.     As of August 5, 2019 (as before) TAL was not in possession of any information

that would permit it to determine whether Dr. Husel was acting outside the scope of his

employment in connection with the events set forth in the 36 civil claims that were brought

against him, the hospital and other medical professionals.

72.     As with the previous RORs, in light of TAL being in possession of no information

to support a determination which would permit it to deny coverage, it agreed to continue

indemnifying Trinity Health for Dr. Husel's Defense Costs.  As a result, Trinity Health notified

Dr. Husel on that same day that "in light of the enclosed second supplemental reservation of

rights letter in the civil matters, Trinity will continue to provide you a defense for the Civil

Claims through appointed counsel, Greg Foliano."

***August 5, 2019 –TAL and THC Deny Coverage and Refuse to Defend Dr. Husel; Issue
Written Explanation Contradicted by Previous Reservation of Rights on Civil Claims and
Unsupported by the Plain Language of the Policy***

73.     While the Indictment lacks any factual detail beyond the identity of the

descendants, the complaints in the parallel civil actions identify the events at issue in each of the

counts in the Indictment.

74.     However, though the 25 counts of the Indictment are based on the same facts at issue in the civil actions, and notwithstanding the fact that TAL is covering the costs of Dr. Husel's defense in each and every civil action, and on the exact same day that TAL issued a reservation of rights letter agreeing to indemnify Trinity Health for Dr. Husel's Defense Costs in defending thirty civil claims, TAL issued a letter denying coverage for the Defense Costs associated with defending against the criminal indictment.  (A copy of the August 5, 2019 letter denying coverage (the "Denial Letter") is attached hereto as Exhibit 13.)

75.     The August 5 letter denying coverage set forth six reasons for denying coverage, several of which are based on purported determination of facts that TAL expressly asserted in its other letter dated the same day that it lacked sufficient evidence to determine.

76.     Specifically, TAL denied coverage on the basis that Dr. Husel was "acting outside his scope of employment" when he prescribed pain relief medication to Mount Carmel Patients which were reviewed and approved by a Mount Carmel pharmacist and administered by a Mount Carmel Nurse.

77.     This position is incompatible with the position TAL took in the First ROR, the Second ROR and the Third ROR, and is in direct breach of its obligations under the plain and unambiguous language in the Policy.

78.     The only currently discernable factual difference between claims alleged in the civil cases, for which TAL is funding a defense, and the counts of the Indictment, for which TAL is refusing to fund a defense, is that THC is not a named party in the Indictment.

79.     While the Reservation of Rights letters all conclude that "veracity of the facts of the New Claims" could not determined, including the one dated August 5, 2019, in the denial

letter (also dated August 5, 2019) TAL presumes the truth of the allegations by deciding that Dr. Husel acted outside of the scope of his employment.

80.     Among the other reasons for denying Dr. Husel's entitlement to a funded defense, TAL claimed that the Indictment does not qualify as a "Loss."

81.     However, a "Loss" is not required for coverage, only a "Loss Event." Since a "Loss Event" has been alleged, the policies obligate THC and TAL to advance Dr. Husel's Defense Expenses expended in defending the Indictment.

82.     Similarly, TAL denied coverage claiming that allegations in the Indictment, that Dr. Husel over-prescribed fentanyl to 25 patients on 25 separate occasions over the course of three years, does not constitute an "Event" under the Policies.

83.     However, the term "Event" is not critical, because the Policies obligate TAL to indemnify and Trinity Health to defend all claims where there is a "Medical Incident" at issue, regardless of the definition of "Event."

84.     Both the 36 civil complaints and the Indictment allege claims arising from a "Medical Incident," specifically the prescribing of pain medication to patients of the hospital; prescriptions which were reviewed and approved by a pharmacist, and administered by a nurse.

85.     TAL then denied coverage on the basis that the Indictments do not give rise to a payment obligation to any third party. But beyond being an irrelevant statement given the basis for the coverage claim, the Ohio statute invoked in the Indictment is punishable by a monetary fine as well as imprisonment.

86.     The Denial Letter also denied coverage by asserting that the claim arises "from the knowing, willful, violation of a penal statute committed by or with the knowledge of the

Insured."  But TAL acknowledged in its other letter issued on August 5, that it is not in possession of evidence in which it can determine the veracity of the claims.

87.    The August 5 Denial Letter also denied coverage on the basis that the criminal indictment seeks non-pecuniary relief.  But this is an attempt to seek to interpret an ambiguous term against the insured.  It is also simply false.  The Indictment seeks pecuniary relief in the form of fines of $15,000 for each of the 25 counts.

88.    The entire basis of refusing to defend Dr. Husel is the argument that the policies do not advance Defense Expenses to defend against criminal allegations.  But nowhere in any of the four policies is this said.  In fact, the opposite is true.  A plain reading of the four policies make clear that they obligate TAL to indemnify, and THC to defend, both civil and criminal allegations.  This obligation is specifically required where – as here – the claims are "false, fraudulent, and groundless."

### Description of the Policies

89.    The Primary Policy provides in Part I entitled Healthcare Professional Liability and Managed Care Liability Coverage for "Defense Costs."

90.    Specifically, the policy provides "[TAL] will also indemnify [Trinity Health] for Defense Costs incurred in connection with a claim arising from Healthcare Professional Liability or Managed Care Liability covered under this Policy, even if any of the allegations of the claim are groundless, false, or fraudulent."

91.    While it is TAL that must indemnify Trinity Health for Defense Costs, it is Trinity Health that has the duty to defend all claims covered by the policy. (Ex. 2, Part VIII Conditions, Defense Duty "[TAL] has no duty to defend any claim. [Trinity Health] has the duty to defend all claims that are covered by this policy.")

92.     The Primary Policy defines **Healthcare Professional Liability** as liability arising out of a **Medical Incident.** A **Medical Incident** means any act, error or omission in the furnishing of or failure to furnish Medical Services. **Medical Services** includes "medical, surgical. . . nursing. . . or care to any person, including (a) the furnishing of medications, drugs . . . or applications in connection therewith.

93.     A **Medical Incident** also includes "any Loss Event. . . that results in injury to any one Patient or any number of **Patients**."

94.     **Loss Event** means as respects Part I, Healthcare Professional Liability: A Medical Incident.

95.     The Primary Policy's definition of an "Insured" includes "[a]n Employee of a Named Insured, including without limitation any physician, resident, or fellow who is an Employee, but while within the scope of his/her duties as such."

96.     Dr. Husel is unquestionably an "Insured" as he was employed by the hospital as an ICU doctor pursuant to an employment contract.

97.     "Defense Expenses" under the Primary Policy mean "those amounts incurred in the investigation, adjustment, defense, settlement, or adjudication of any claim brought against an Insured that is covered under this Policy.  Defense Expenses include (1) legal expenses, attorney's fees, and court costs. . ."

98.     Under the Primary Policy**, "**Healthcare Professional Liability" means liability arising out of any act, error or omission in the furnishing of or failure to furnish care to any person, including the furnishing of medications, drugs or applications in connection therewith.

99.     The Buffer Policy (Ex. 3), Excess Policy (Ex. 4), and High Excess Policy (Ex. 5) are all "follow-form" policies that "follow[], appl[y] in conformance with, and [are] subject to

18

the same terms, insuring agreements, exclusions, conditions, definitions, endorsements and other provisions that apply to Group I Health Care Professional Liability, […], of the Followed Policy [(the Excess Policy)].  Significantly, each of the follow-form policies provide that "[i]f any of the terms or provisions applicable to Group I, Health Care Professional Liability […] of the Followed Policy are inconsistent with the terms and provisions of this policy, the terms and provisions of this policy will control."

100.    The High Excess Policy provides two relevant exclusions:

First--

To any liability arising out of dishonest, fraudulent, malicious or criminal acts committed by the Insured.  However, for purpose of determining the applicability of this exclusion, no act of any Insured will be imputed to any other Insured who did not commit or participate in such act. *Further, this exclusion will apply only if it is determined by final adjudication that the Insured committed such an act*.

And Second--

To any liability arising out of the willful violation of any law, statute, regulation or ordinance committed by the Insured.  However, for purposes of determining the applicability of this exclusion, no act of any Insured will be imputed to any other Insured who did not commit or participate in such act.  *Further, this exclusion will apply only if it is determined by final adjudication that the Insured committed such an act*.

(emphasis added).

101.    The Primary Policy contains no exclusions to coverage in connection with allegations of "willful violation of any law, statute, regulation or ordinance committed by the Insured."

102.    As a result of TAL's denial, Dr. Husel has been injured by virtue of TAL's refusal to reimburse the more than $75,000 he has already paid his defense counsel in the criminal action, and by the perspective loss of defense costs.

## CAUSES OF ACTION

### First Cause of Action
### (Against all Defendants)
### (Declaratory Judgment – Advancement of Legal Fees)

103.     Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as though fully set forth herein.

104.     Dr. Husel is an insured under each of the Policies.

105.     Each of the 25 counts of the Indictment relates to an instance in which Dr. Husel provided care to a patient in connection with his employment as a physician in Mount Carmel's ICU.

106.     Each of the 25 counts of the Indictment alleges facts that, if proven, would constitute a separate and distinct "Medical Incident" under the Policies.

107.     "Medical Incidents" constitute "Loss Events" under the Policies.

108.     The Policies contain no exclusions for allegations of criminal conduct unless it is "determined by final adjudication that the Insured committed such an act."

109.     The Policies contain no other applicable exclusions to the obligation to advance the costs of Dr. Husel's defense.

110.     The Policies require THC to defend Dr. Husel for claims arising from actual or alleged Medical Incidents, and require TAL to pay the costs of such defense.

111.     Under applicable law, given the existence of an adverse relationship between THC and Dr. Husel, as evidence by calls placed by THC to the families of decedents who had been under Dr. Husel's care set forth in paragraphs []-[] above, THC may not select Dr. Husel's counsel.

112.    On July 8, 2019, Dr. Husel demanded that THC and TAL advance the costs of his criminal defense.

113.    On August 5, 2019, TAL denied Dr. Husel's claim for advancement of the costs of his criminal defense to the counts of the Indictment.

114.    The reasons articulated in the Denial Letter are directly contradicted by the reasons articulated in the First ROR, Second ROR and Third ROR (relating to civil claims based on the same alleged Medical Incidents but in which the Hospital is also a defendant) and are not supported by a plain reading of the insurance policies.

115.    There is an actual controversy, and Dr. Husel is entitled to a declaration of his rights to the advancement of legal costs and fees in connection with his defense to the counts of the Indictment.

**Second Cause of Action**
**(Against all Defendants)**
**(Specific Performance and Preliminary Injunction)**

116.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as though fully set forth herein.

117.    Dr. Husel is an insured under each of the Policies.

118.    Each of the 25 counts of the Indictment relates to an instance in which Dr. Husel provided care to a patient in connection with his employment as a physician in Mount Carmel's ICU.

119.    Each of the 25 counts of the Indictment alleges facts that, if proven, would constitute a "Medical Incident" under the Policies.

120.    "Medical Incidents" constitute "Loss Events" under the Policies.

121.   The Policies contain no exclusions for allegations of criminal conduct unless it is "determined by final adjudication that the Insured committed such an act."

122.   The Policies contain no other applicable exclusions to the obligation to advance the costs of Dr. Husel's defense.

123.   The Policies require THC to defend Dr. Husel for claims arising from actual or alleged Medical Incidents, and require TAL to pay the costs of such defense.

124.   Under applicable law, given the existence of an adverse relationship between THC and Dr. Husel, as evidenced by calls placed by THC to the families of decedents who had been under Dr. Husel's care set forth in paragraphs []-[] above, THC may not select Dr. Husel's counsel.

125.   On July 8, 2019, Dr. Husel demanded that THC and TAL advance the costs of his defense.

126.   On August 5, 2019, TAL denied Dr. Husel's claim for advancement of the costs of his criminal defense to the counts of the Indictment.

127.   The reasons articulated in the Denial Letter are directly contradicted by the reasons articulated in the First ROR, Second ROR and Third ROR (relating to civil claims based on the same alleged Medical Incidents but in which the Hospital is also a defendant).

128.   Given the pendency of the criminal action, TAL and THC's refusal to advance the costs of his defense are causing ongoing immediate and irreparable harm to Dr. Husel.

129.   Therefore, Dr. Husel is entitled to a preliminary injunction requiring TAL and THC to specifically perform their duties under the Policies and advance the costs of Dr. Husel's defense during the pendency of this action.

130.    Dr. Husel lacks an adequate remedy at law because, without advancement, he will be unable to defend himself in the same manner that he would had THC and TAL complied with their contractual obligations.

**Third Cause of Action**
**(Against all Defendants)**
**(Specific Performance and Permanent Injunction)**

131.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as though fully set forth herein.

132.    Dr. Husel is an insured under each of the Policies.

133.    Each of the 25 counts of the Indictment relates to an instance in which Dr. Husel provided care to a patient in connection with his employment as a physician in Mount Carmel's ICU.

134.    Each of the 25 counts of the Indictment alleges facts that, if proven, would constitute a "Medical Incident" under the Policies.

135.    "Medical Incidents" constitute "Loss Events" under the Policies.

136.    The Policies contain no exclusions for allegations of criminal conduct unless it is "determined by final adjudication that the Insured committed such an act."

137.    The Policies contain no other applicable exclusions to the obligation to advance the costs of Dr. Husel's defense.

138.    The Policies require THC to defend Dr. Husel for claims arising from actual or alleged Medical Incidents, and require TAL to pay the costs of such defense.

139.    Under applicable law, given the existence of an adverse relationship between THC and Dr. Husel, as evidence by calls placed by THC to the families of decedents who had

23

been under Dr. Husel's care set forth in paragraphs []- [] above, THC may not select Dr. Husel's counsel.

140.     On July 8, 2019, Dr. Husel demanded that THC and TAL advance the costs of his defense.

141.     On August 5, 2019, TAL denied Dr. Husel's claim for advancement of the costs of his defense to the counts of the Indictment.

142.     The reasons articulated in the Denial Letter are directly contradicted by the reasons articulated in the First ROR, Second ROR and Third ROR (relating to civil claims based on the same alleged Medical Incidents but in which the Hospital is also a defendant).

143.     Given the pendency of the criminal action, TAL and THC's refusal to advance the costs of his defense are causing ongoing immediate and irreparable harm to Dr. Husel.

144.     Therefore, Dr. Husel is entitled to a permanent injunction requiring TAL and THC to advance the costs and Dr. Husel's defense.

145.     Dr. Husel lacks an adequate remedy at law because, without advancement, he will be unable to defend himself in the same manner that he would had THC and TAL complied with their contractual obligations.

**Fourth Cause of Action**
**(Breach of Contract)**

146.     Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as though fully set forth herein.

147.     Dr. Husel is an insured under each of the Policies.

148.     Each of the 25 counts of the Indictment relates to an instance in which Dr. Husel provided care to a patient in connection with his employment as a physician in Mount Carmel's ICU.

149.    Each of the 25 counts of the Indictment alleges facts that, if proven, would constitute a "Medical Incident" under the Policies.

150.    "Medical Incidents" constitute "Loss Events" under the Policies.

151.    The Policies contain no exclusions for allegations of criminal conduct unless it is "determined by final adjudication that the Insured committed such an act."

152.    The Policies contain no other applicable exclusions to the obligation to advance the costs of Dr. Husel's defense.

153.    The Policies require THC to defend Dr. Husel for claims arising from actual or alleged Medical Incidents, and require TAL to pay the costs of such defense.

154.    Under applicable law, given the existence of an adverse relationship between THC and Dr. Husel, as evidence by calls placed by THC to the families of decedents who had been under Dr. Husel's care set forth in paragraphs []-[] above, THC may not select Dr. Husel's counsel.

155.    On July 8, 2019, Dr. Husel demanded that THC and TAL advance the costs of his defense.

156.    On August 5, 2019, TAL denied Dr. Husel's claim for advancement of the costs of his defense to the counts of the Indictment.

157.    The reasons articulated in the Denial Letter are directly contradicted by the reasons articulated in the First ROR, Second ROR and Third ROR (relating to civil claims based on the same alleged Medical Incidents but in which the Hospital is also a defendant).

158.    As of the filing of this motion, Dr. Husel has spent more than $75,000 on defense costs that should have been advanced under the Policies.

159.    Given the pendency of the criminal action, TAL and THC's refusal to advance the costs of his defense constitute a breach of the Policies.

160.    Dr. Husel is entitled to reimbursement of all fees covered under the Policies that he has been forced to pay due to THC and TAL's breach, up until the date such repayment is made, and pay all other such fees directly to Mr. Husel's counsel until and unless there is a final adjudication that he engaged in conduct that would void his coverage.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    On the First Cause of Action, a declaration that under the applicable polices, TAL and THC must advance the legal fees and costs incurred by Dr. Husel in connection with the defense of the criminal action, that TAL and THC must accept Dr. Husel's choice of counsel, and that each count in the Indictment which refers to a different Medical Incident constitutes a separate and distinct claim under the policies;

B.    On the Second Cause of Action, a preliminary injunction requiring TAL and THC to advance the legal fees and costs incurred by Dr. Husel in connection with the defense of the criminal action up to and including the applicable policy limits;

C.    On the Third Cause of Action, a preliminary injunction requiring TAL and THC to advance the legal fees and costs incurred by Dr. Husel in connection with the defense of the criminal action up to and including the applicable policy limits;

D.    On the Fourth Cause of Action, awarding Plaintiff a sum equal to all fees paid or advanced to his chosen counsel in the criminal action, and no less than $75,000;

E.      On any and all Causes of Action, awarding Plaintiff such other and further relief,

including but not limited to equitable relief, punitive damages, prejudgment

interest, the costs of this action, and attorney's fees, as the Court may deem just

and appropriate.

Dated: August 22, 2019
       New York, NY

                                                Respectfully submitted,


                                                _____
                                                FORD O'BRIEN LLP
                                                Adam C. Ford
                                                575 Fifth Avenue
                                                17th Floor
                                                New York, NY 10017
                                                (212) 858-0040
                                                aford@fordobrien.com



                                                *Attorney for Plaintiff William S. Husel*