**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

DR. WILLIAM S. HUSEL, M.O.

      Plaintiff,

           – against –

TRINITY HEALTH CORPORATION, and
TRINITY ASSURANCE LIMITED
(CAYMAN),

           Defendants.

Case No.: 19-CV-12478

Hon. George Caram Steeh

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Dr. William S. Husel, M.O. moves for a Preliminary Injunction pursuant to Fed R. Civ. P. 65 by his undersigned attorneys. Plaintiff moves for a declaration and preliminary injunction against Defendant insurance company, Trinity Assurance Ltd. ("TAL" or "the Insurer") and its First Named Insured, defendant Trinity Health Corporation ("Trinity Health" or "THC") to advance "Defense Expenses" (as defined in the applicable insurance policies) to Dr. Husel for all legal costs, fees and expenses incurred by him in connection with the defense of a criminal proceeding currently pending in Franklin County, Ohio, which is based on allegations of wrongful conduct taken in the scope of Dr. Husel's employment as a physician in one of THC's hospitals.

Intervention by this court is necessary as Plaintiff will suffer irreparable harm and Plaintiffs' motion is supported by the Complaint and its attachments. (Dkt. No.1).

Local Rule 7.1(a)(1) requires Plaintiffs to ascertain whether this Motion will be opposed. Because this Motion is being filed soon after the filing of the Complaint, no attorney for Defendants has entered an Appearance. Nevertheless, counsel for Plaintiffs have sought concurrence in the relief sought in this Complaint and Motion from the Defendant Trinity Health,

and received a denial coverage letter signed by Michelle Aiello dated August 5, 2019. (Dkt. 1, Cmplt. Ex. 13). The reasons articulated in the Denial Letter are directly contradicted by the reasons articulated in the First ROR, Second ROR and Third ROR (relating to civil claims based on the same alleged Medical Incidents but in which the Hospital is also a defendant). As of the filing of this motion, Dr. Husel has spent more than $75,000 on defense costs that should have been advanced under the Policies. Given the pendency of the criminal action, TAL and THC's refusal to advance the costs of his defense constitute a breach of the Policies. Dr. Husel is entitled to reimbursement of all fees covered under the Policies that he has been forced to pay due to THC and TAL's breach, up until the date such repayment is made, and pay all other such fees directly to Mr. Husel's counsel until and unless there is a final adjudication that he engaged in conduct that would void his coverage.

Without the intervention of this Court, Plaintiff will suffer irreparable harm. The equities weigh strongly in favor of an injunction. Plaintiff requests for immediate consideration of this motion.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant his Motion for Preliminary Injunction and grant such other relief as the Court deems just and proper.

Dated: August 26, 2019

Respectfully submitted,

_____

FORD O'BRIEN LLP
Adam C. Ford
575 Fifth Avenue
17th Floor
New York, NY 10017
(212) 858-0040
aford@fordobrien.com

*Attorneys for Plaintiff Dr. William S. Husel*

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2019, the foregoing was filed electronically with the Clerk of the Court by using the CM/ECF system, and that a copy of the foregoing will be delivered to a process server for service on defendants.

/s/ Adam C. Ford
Adam C. Ford

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

DR. WILLIAM S. HUSEL, M.O.

      Plaintiff,

            – against –

TRINITY HEALTH CORPORATION, and
TRINITY ASSURANCE LIMITED
(CAYMAN),

             Defendants.

Case No.: 19-CV-12478

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**PRELIMINARY INJUNCTION AND DECLARATORY RELIEF**

IMMEDIATE CONSIDERATION REQUESTED

FORD O'BRIEN LLP

Adam C. Ford
575 Fifth Avenue, 17th Floor
New York, New York 10017
aford@fordobrien.com
(212) 858-0040

August 26, 2019

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 4

ARGUMENT ................................................................................................................. 14

   I.   Dr. Husel is Likely to Establish THC's and TAL's Duty to Defend............................ 14

     A.  When Insurance Policies Intend to Exclude Covering Defense Expenses for Criminal Indictments They State So Explicitly – the Policies Here Do Not .............................. 16

     B.  The Plain Language of the Policies Establishes the Duty to Defend by Advancing Defense Expenses to Dr. Husel for not just the Civil Lawsuits as Already Agreed but the Criminal Indictment too ......................................................................................... 17

     C.  Plaintiff Can Easily Show Irreparable Harm if His Contractual Right to a Paid Defense Is Violated ...................................................................................................... 20

     D.  The Equities Balance in Favor of Enforcing Trinity Health and TAL to Defend Dr. Husel by advancing his Defense Expenses by Preliminary Injunction ....................... 21

   II.  None of THC and TAL's Reasons for Denial Defeat the Obligation to Defend............ 22

     A.  Allegations of Intentional Misconduct that, if Proven, Would not Qualify for Coverage Must Still Be Defended Until There Has Been a Final Adjudication of the Conduct as set Forth in the Excess Policy, Which Is Precisely the Position TAL and TAC Took in Their Reservation of Rights Letter Covering Defense Expenses Related to the Civil Cases ........................................................................................................... 22

     B.  The Exclusions Cited by TAL in its Denial Letter Are Inapplicable as They Fail to Clearly and Unambiguously Exclude Defense Expenses for Defending a Criminal Indictment ................................................................................................................... 23

   III.  Having Taken Demonstrably Adverse Actions Towards Dr. Husel, Including Violating the Duty to Defend, Defendants May No Longer Exercise any Purported Right to Select Dr. Husel's Counsel ............................................................................... 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Affiliated FM Ins. Co. v. Owens-Corning Fiberglass Corp.,*
  16 F.3d 684 (6th Cir. 1994) .................................................................... 19

*Bumper Mfg. Co. v. Hartford Ins. Co.,*
  207 Misch. App 60 (1994) .................................................................... 15

*Cincinnati Insurance Co. v. Zen Design Group, Ltd.,*
  329 F.3d 546 (6th Cir. 2003) ................................................................ 14

*Heideman v. S. Salt Lake City,*
  348 F.3d 1182 (10th Cir. 2003) ............................................................ 21

*Leonor v. Provident Life and Acc. Co.,*
  18 F. Supp. 3d 863 (E.D. Mich. 2014) .................................................. 19

*Lusk v. Imperial Cas. & Indemnity Co.,*
  605 N.E.2d 420 (Ohio Ct. App. 1992) .................................................. 25

*Medpace, Inc. v. Darwin Select Ins. Co.,*
  13 F. Supp. 3d 839 (S.D. Ohio 2014) ................................................... 18

*Red Head Brass, Inc. v. Buckeye Union Ins. Co.,*
  735 N.E.2d 48, 55 (Ohio App. Ct. 1999) ............................................. 25

*Sherwin-Williams Co. v. Certain Underwriters at Lloyd's London,*
  813 F.Supp.576 (N.D. OH 1993) ......................................................... 15

*State Auto. Mut. Ins. Co. v. Security Taxicab, Inc,*
  144 Fed. Appx. 512 (6th Cir. 2005) ..................................................... 19

*United of Omaha Life Ins. Co. v. Kay,*
  751 Fed. Appx. 636 (6th Cir. 2018) ..................................................... 19

*Vacco v. Quill,*
  521 U.S. 793 (1997) .............................................................................. 2

*Westfield Ins. Co. v. HealthOhio, Inc.,*
  73 Ohio App. 3d 341 (1992) ................................................................. 24

## Statutes and Rules

Fed R. Civ. P. 65 ..................................................................................... 1

Pursuant to Fed R. Civ. P. 65, by his undersigned attorneys, Plaintiff Dr. William S. Husel ("Dr. Husel") hereby moves for a declaration and preliminary injunction against Defendant insurance company, Trinity Assurance Ltd. ("TAL" or "the Insurer") and its First Named Insured, defendant Trinity Health Corporation ("Trinity Health" or "THC") to advance "Defense Expenses" (as defined in the applicable insurance policies) to Dr. Husel for all legal costs, fees and expenses incurred by him in connection with the defense of a criminal proceeding currently pending in Franklin County, Ohio, which is based on allegations of wrongful conduct taken in the scope of Dr. Husel's employment as a physician in one of THC's hospitals.

## PRELIMINARY STATEMENT

Dr. Husel, a well-respected and caring doctor finds himself in the strangest position of having been indicted on twenty-five counts of murder for providing appropriate palliative care to 25 dying patients whom he was tasked with prescribing pain medication for in their last moments of life in the Intensive Care Unit at Mount Carmel Hospital. The allegations, as set forth in more detail in related civil cases, are that Dr. Husel wrote prescriptions for pain relief medication that were ultimately administered to patients after their families had decided to withdraw all life-saving support,[1] and that these prescriptions "hastened [the patients'] death[s]." There are no factual allegations (in either the civil complaints or criminal indictment) that Dr. Husel intended to hasten the death of anyone. In each case, Dr. Husel made a good-faith professional judgment to prevent suffering during his patients' final moments. While the Indictment alleges twenty-five separate events, involving 25 separate patients and spanning three years, the allegations contain some similarities. The allegations are not that Dr. Husel administered this pain medication

---

[1] The hospital's statement on the matter can be viewed at https://youtu.be/Ea8WmL3Sd_M. There, the President/CEO explains that *all* prescriptions were ordered after the family had independently decided to withdraw further lifesaving support (video at 0.17-0.40) ("during the five years that he worked here this doctor ordered significantly excessive and potentially fatal doses of pain medication for 27 patients who were near death. These patients' families had requested that all life saving measures be stopped.")

himself, but rather that Dr. Husel wrote a prescription which was then provided to the hospital pharmacists, and that each of the several pharmacists, independently and on separate occasions, reviewed the prescription and verified that the dosage was appropriate for the respective patient's palliative care.  The pharmacists then entered the prescription into the hospital's computer software which was designed to alert the pharmacist of any error or potential problem with the prescription.  After entering the prescription into the system, an ICU nurse administered the pain relief medicine to the patient as part of end-of-life comfort, or palliative care.

Dr. Husel is not accused of acting alone or in concert with just one pharmacist or one nurse. Rather the actions at issue involve at least ***48 hospital pharmacists and nurses*** over a three-year period.  But no one other than Dr. Husel has been criminally charged, nor should they have been. Dr. Husel should not have been charged either, because his good-faith conduct is shielded from prosecution under Supreme Court precedent in *Vacco v. Quill*, 521 U.S. 793 (1997). The Court in *Vacco* recognized the "double-effect" of palliative care in which the prescription of medication for pain relief – *even when it hastens death* – is an acceptable form of care, providing doctors with necessary protection from undue litigation or even criminal prosecution in connection with the extremely sensitive responsibility of providing compassionate care for patients as they die. Similarly, the Ohio Revised Code, Chapter 2133 Modified Uniform Rights of the Terminally Ill Act and the DNR Identification and Do-Not Resuscitate Order Law, Section 2133: Immunities, grants immunity from criminal prosecution to doctors:

> "Prescribing… or causing to be administered by judicious titration or in another manner any form of medication, for the purpose of diminishing the … patient's pain or discomfort and not for the purpose of postponing or causing the qualified patient's or other patient's death, even though the medical procedure, treatment, intervention, ***or other measure may appear to hasten or increase the risk of the patient's death, if the attending physician so prescribing, dispensing, administering, or causing to be administered or the health care personnel acting under the direction of the attending physician so dispensing, administering, or causing to be***

*administered are carrying out in good faith the responsibility to provide comfort care…"*

This background, however, is merely illustrative of the context in which the instant dispute arises.  The question before this Court is whether the Healthcare Liability Insurance Policies (the "Policies") that cover Dr. Husel (and all employees of Mount Carmel/Trinity Health) impose on the insurer a "duty to defend" including an obligation to advance Dr. Husel's Defense Expenses so that he may properly defend himself with counsel of his selection.  The Insurer will ask this Court to imply an exclusion to the applicable Policies to limit the duty to defend the civil cases only, and exclude coverage for the criminal case.  But the Policies contain no such exclusion.  Without a clear and explicit exclusion for criminal cases, applicable law prevents this Court from imposing one.  In interpreting the scope of the duty to defend in an insurance policy, courts are required find the duty exists wherever a claim *might* be covered, resolving all ambiguities in favor of the insured.

The Primary Policy at issue provides coverage for defense expenses incurred by Dr. Husel in defense of the allegations contained in the criminal indictment.  Part I of the Primary Policy provides coverage for certain Loss Events, defined as, among other things, "Healthcare Professional Liability" which is defined broadly as "liability arising out of a Medical Incident" which means "any act, error or omission in the furnishing of or failure to furnish Medical Services" including "the furnishing of medications [or] drugs…"  Part VIII of that policy provides that Trinity Assurance will "indemnify [Trinity Health (which has the explicit "Duty to Defend" an Insured such as Dr. Husel)] for Defense Expenses incurred in connection with a claim arising from Healthcare Professional Liability covered under the Policy, even if any of the allegations of the claim are groundless, false or fraudulent." As such coverage is plainly applicable, THC has a Duty to Defend by advancing Defense Expenses and TAL has the duty to

indemnify THC. Because the indictment – just as the civil complaints – is based on allegations that Dr. Husel prescribed too much pain medication in the course of his employment, the Primary Policy provides coverage for any and all defense expenses which Dr. Husel may incur in proving his good faith and innocence.

TAL's primary basis for denying the obligation to defend – that allegations of criminal conduct are excluded from coverage – is baseless.  Nowhere do the policies say that. Proof positive of this reading beyond the plain language is that the insurance company has agreed – and continues to agree – to pay the Defense Expenses for dozens of civil lawsuits filed against Dr. Husel and the hospital, which are based on the exact same allegations at issue in the criminal indictment, namely that Dr. Husel intentionally prescribed pain medication to hasten patients' death as opposed to alleviating pain.  Having acknowledged that the policies obligated the insurer to advance Defense Expenses in the civil cases, there is no intellectually honest way to deny Defense Expenses for the groundless criminal case against him.

## STATEMENT OF FACTS

### *Dr. Husel's Employment at Mount Carmel*

Dr. William S. Husel, M.O. was employed as a doctor in the ICU at Ohio's Mount Carmel West hospital, an affiliate of Trinity Health, from 2013 until December 2018.  Among his responsibilities in caring for patients in the ICU was the prescription of pain medication, including morphine, fentanyl, Versed, and Dilaudid – all commonly-prescribed narcotics and sedatives used to make patients feel relaxed or sleepy, and to alleviate the severe pain that can be experienced during the process of dying.

Given the risk for liability associated with working as a doctor in an ICU, as part of his employment agreement, Dr. Husel was guaranteed that his employer would provide him with "professional liability insurance for all activities conducted in the course of employment"

(Cmplt. Ex. 1).  Trinity Health did in fact obtain the promised insurance policies, issued by TAL. This professional liability insurance covers "Defense Expenses incurred in connection with a claim arising from Healthcare Professional Liability . . . even if any of the allegations of the claim are groundless, false, or fraudulent."

### *December 2018 – Mount Carmel Contacts Families of Deceased Patients to Allege that Dr. Husel Prescribed End-of-Life Pain Medication that Hastened Death*

The patients who Dr. Husel is accused of purposefully killing – without any motive as the prosecutor has publicly admitted – were patients all facing imminent death, with no chance of surviving without continued medical intervention to maintain their lives, and whose families had decided to remove from life support.  Dr. Husel's hometown newspaper, the Columbus Dispatch, reviewed the medical records of the individuals he is accused of murdering by writing a prescription for pain medication after being removed from life support. Here is their description:

> Rebecca Walls, 75, of the South Side arrived at the hospital on Nov. 13, 2018 with increased difficulty breathing. She developed a blood clot and was transferred to the ICU. The doctor talked to the family on Nov. 19 and they agreed to provide comfort care. She was given 1,000 micrograms of fentanyl and 10 mg of Versed at 1:26 a.m., and died six minutes later.
>
> Melissa Penix, 82, of Grove City arrived at the hospital with difficulty breathing on Nov. 15, 2018 and was transferred to the ICU for further monitoring. Her family asked that the ventilator be removed. She was given 2,000 micrograms of fentanyl and 10 mg of Versed at 10:48 and 10:40 p.m., respectively, and died at 10:53.
>
> James Allen, 80, of Franklinton, was taken to the hospital on May 24, 2018 because of septic shock and was transferred to the ICU on May 28. He was given 1,000 micrograms of fentanyl and 6 mg of Versed at 11:20 p.m. on May 28, and died 20 minutes later.
>
> Emma Bogan, 75, of the Far West Side was taken to the hospital on Feb. 10 with septic shock. Medical records indicate that a doctor explained the grave situation to the family and they decided to take her off the ventilator.  She died at 1:07 a.m. on Feb. 11, 2015, two minutes after she was given 400 micrograms of fentanyl and 4 micrograms of Versed.
>
> Jan Marlene Thomas, 65, of the Far West Side was brought to the hospital in respiratory arrest on Feb. 28, 2015 and was diagnosed with multi-embolic stroke. Medical records indicate her family has asked that she be removed from the ventilator. She was given 800 micrograms of fentanyl at 12:11 a.m. on March 1 and died at 12:42 a.m.
>
> Joanne S. Bellisari, 69, of the West Side. She arrived at the hospital April 22, 2015 after a seizure. The family decided to withdraw care on May 10, medical records indicate she was given 1,000 micrograms of fentanyl at 11:32 p.m. on May 10 and died eight minutes later.

Michael Walters, 57, arrived at the hospital on Oct. 6, 2017 with acute brain swelling and respiratory failure. The family was encouraged to change his status to do not resuscitate, and agreed. He was given 500 micrograms of fentanyl at 4:11 a.m. on Oct. 11, and died eight minutes later.

Larry Brigner, 70, of the South Side arrived at the hospital on Dec. 10, 2017 due to an altered mental state related to a history of cancer. A doctor's note said he discussed Brigner's grim prognosis, and the family decided to withdraw care. He was given 500 micrograms of fentanyl and 4 mg of Versed at 10:36 p.m., and died 5 minutes later.

(Cmplt. Ex. 7).

None of these patients' families had any reason to suspect that their dying loved ones had received anything other than the appropriate palliative care in the ICU at the end of their lives, given their decision to withdraw artificial life support and to not resuscitate the patient. Indeed, as is obvious, when a patient is dying, doctors have an ethical responsibility to anticipate and treat pain, including but not limited to dyspnea-associated respiratory distress, anxiety, delirium, post-extubation stridor, and excessive broncho-pulmonary secretions.[2] After discontinuation of ventilation, without proper medication, excessive respiratory secretion is common, resulting in a "death rattle" that gives rise to the relatives' perception that the patient is choking and suffering. Indeed, when an individual is being kept alive through a ventilator and other artificial means and those means are removed, without adequate pain medication, the experience of death is very painful. ICU doctors must monitor their patients' comfort during the process of withdrawing life support, and titrate medications for any signs of distress, which frequently include tachypnea, labored breathing, accessory muscle use, nasal flaring, tachycardia, diaphoresis, grimacing, restlessness, and excess or noisy secretions. The use of fentanyl offers anticonvulsant effects that may protect from hypoxemia-related seizures. In the ICU, fentanyl is often the preferred narcotic because of staff familiarity with this agent while morphine is more likely to lead to toxicity at high doses. Dr. Husel's conduct was at all times consistent with his ethical

---

[2] Anticipation of distress after discontinuation of mechanical ventilation in the ICU at the end of life, E. J. O. Kompanje, B. van der Hoven, and J. Bakker, Intensive Care Med. 2008 Sep; 34(9): 1593–1599, found at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2517089/

responsibility to manage his patients' pain and suffering. Dr. Husel as a trained anesthesiologist, was very familiar with the drug fentanyl. He had witnessed patients and their families needlessly suffer from the use of too little fentanyl during the withdrawal of life support, and as his career progressed, his prescriptions reflected a deep concern with alleviating pain and discomfort for his dying patients.

As the medical literature makes clear, end of life prescriptions for opioids can appear high compared to doses used for life-saving or sedative purposes. However, these doses are necessary to alleviate the intense pain associated with dying, and the failure to use these high-doses risks unnecessary pain and suffering to the patients and their families.[3]  As numerous scholarly articles highlight, these high doses can lead untrained medical staff to be concerned.

In October 2018, Mount Carmel hospital received a "formal report" from a pharmacist regarding the level of pain medication being prescribed by Dr. Husel to terminally-ill patients. This initial question did not lead to any hospital response whatsoever.  After a subsequent inquiry from another pharmacist, the hospital began an internal inquiry.  This employee, a pharmacist, made the report raising a question as to the dosage because *the hospital itself* did not

---

[3] See, The Infusion of Opioids During Terminal Withdrawal of Mechanical Ventilation in the Medical Intensive Care Unit, Journal of Pain and Symptom Management Vol. 42, No. 1, July 1, 2011, 44 Mark A. Mazer, MD, Chad M. Alligood, PharmD, and Qiang Wu, PhD, Brody H, Campbell ML, Faber-Langendoen K, Ogle KS. Withdrawing intensive life-sustaining treatment -- recommendations for compassionate clinical management. *N Engl J Med* 1997;336: 652-7; Campbell ML. Terminal dyspnea and respiratory distress. *Crit Care Clin*. 2004; 20:403-17; Curtis JR, Rubenfeld GD, eds. *Managing Death in the Intensive Care Unit: The Transition from Cure to Comfort*. New York, Oxford University Press, 2001; Hawryluck LA, Harvey WRC, Lemieux-Charles L, Singer PA. Consensus guidelines on analgesia and sedation in dying intensive care unit patients. *BMC Medical Ethics* 2002;3:3. www.biomedcentral.com/1472-6939/3/3; O'Mahoney S, McHugh M, Zallman L, Selwyn P. Ventilator withdrawal: procedures and outcomes. Report of a collaboration between a critical care division and a palliative care service. *J Pain Symptom Manage* 2003; 26: 954-961; Prendergast TJ, Puntillo KA. Withdrawal of life support: intensive caring at the end of life. *JAMA* 2002:288:2732-274; Truog RD, Cist AFM, Brackett SE, Burns JP, Curley MAQ, Danis M, DeVita MA, Rosenbaum SH, Rothenberg DM, Sprung CL, Webb SA, Wlody GS, Hurford WE. Recommendations for end-of-life care in the intensive care unit: The Ethics Committee of the Society of Critical Care Medicine. *Crit Care Med* 2001;29:2332-2348; Treece PD, Engelberg RA, Crowley L, Chan JD, Rubenfeld GD, Steinberg KP, Curtis, JR. Evaluation of a standardized order form for the withdrawal of life support in the intensive care unit. *Crit Care Med* 2004; 32:1141-1148; Way J, Back AL, Curtis JR. Withdrawing life support and resolution of conflict with families. *BMJ* 2003; 325:1342-1345.

have any policies or procedures regarding the prescription or administration of pain relief during the withdrawal of life support.

A couple hospital employees conducted a quick and superficial "investigation" which ended with an incomprehensible course of action: a hospital administrator called the families of dozens of deceased patients and "informed" each of them that their loved ones' death had been purposefully hastened by Dr. Husel and dozens of nurses and pharmacists. Then, in January 2019, the hospital took this information to the local prosecutor, and called the families again, this time to "inform" them that their loved ones' hastened death had not been an isolated occurrence, but involved Dr. Husel and numerous other hospital employees on over thirty occasions.  Dozens of civil lawsuits followed.

### Early 2019 – Mount Carmel's Allegations Lead to Dozens of Lawsuits, THC and TAL Comply with Their Obligation to Defend Dr. Husel Under the Contract of Insurance at Issue Here and Appoints Counsel

By January 29, 2019, four civil lawsuits against the hospital, Dr. Husel, and several pharmacists and nurses were filed, each alleging that a patient – *at the time of dying* – was prescribed pain relief medication by Dr. Husel, which was "reviewed and approved by a Mount Carmel[] pharmacist" and that "the medication was made available to the patient's nurse." (Cmplt. Ex. 8).  These four civil complaints allege that each pharmacist knew that the dosage of pain medication prescribed for a dying patient was allegedly "grossly inappropriate, served no therapeutic purpose or function, and would only serve to hasten the termination of patient's life." Each complaint alleges that the nurse "administered the lethal dosage" "with full knowledge that such a grossly inappropriate dose of fentanyl would hasten the termination of [the patient's] life."  Each of these four complaints also alleged that "Plaintiff received a call from a physician-administrator affiliated with Mount Carmel [and] [t]hat administrator informed Plaintiff that her [family member] was given an excessive dosage of fentanyl by Defendants which hastened

and/or caused [the patient's] premature death" and that all these individuals were suspended from patient care. (Cmplt. Ex. 8).

Each of the civil complaints further alleged that "Defendants, individually or by and through agents or employees, intentionally ordered and administered a grossly inappropriate and lethal dosage of the narcotic, fentanyl, designed to cause serious harm and death to [the patient]." Finally, the complaints each alleged that the conduct of many defendants "could only result from Mount Carmel's systemic deficiencies and practices, which Mount Carmel failed to remedy, and which resulted in significant harm (death) to at least 26 patients."

Having been put on notice of these civil claims, Dr. Husel made a demand on TAL that his Defense Expenses be advanced. TAL sent Dr. Husel a Reservation of Rights letter dated January 29, 2019 agreeing the allegations fell within the plain language of required coverage and accepting the duty to defend.  (Cmplt. Ex. 9).  That letter described the Policies, the terms of coverage and exclusions and concluded that "until the veracity of the facts of the Claims is determined, it is unclear whether Dr. Husel is insured by TAL for the Claims.  Accordingly, TAL reserves its rights and defenses with respect to the Claims as it relates to coverage for Dr. Husel under the Policies."  (*Id.*).  In other words, because there was no determination as to the veracity of the allegations that Dr. Husel intended to cause the death of any patient, TAL agreed to indemnify Trinity Health for all of Dr. Husel's Defense Expenses.  Given this conclusion, and pursuant to "Part VIII Conditions: Section A: Defense Duty" of the Primary Policy, which obligates Trinity Health to defend Dr. Husel for all claims made against the policy, Trinity Health notified Dr. Husel that Trinity Health would advance his defense costs subject to the same reservation of rights.

On April 15, 2019, TAL provided Trinity Health Corporation with a "Supplemental Reservation of Rights re: Dr. William Dr. Husel" to account for "multiple additional complaints

as brought by an additional 26 claimants.  (Cmplt. Ex. 10). These additional 26 complaints largely mirrored the original four, setting forth allegations of an additional 26 separate and distinct medical incidents.  This reservation of rights letter largely mirrored the original one, and concluded, once again, that "until the veracity of the facts of the New Claims is determined, it is unclear whether Dr. Husel is insured by TAL for the New Claims."  Because there was no basis on which to deny coverage for these claims, Trinity Health continued to provide a defense for Dr. Husel for each of these 26 civil claims, and to advance his Defense Expenses, and TAL continued to indemnify Trinity Health for all Defense Expenses Trinity Health advanced, a determination which was transmitted to Dr. Husel on August 2, 2019.

### *June 2019 – Dr. Husel Is Indicted for 25 Individual Counts of Murder, Ranging from February 2015 to November 2018, on the Theory that Dr. Husel's Issuance of Prescriptions for Pain Medication Constituted the "Purposeful" Cause of Death in Each Case*

On June 5, Dr. Husel was indicted on 25 counts of murder in Franklin County, Ohio, pursuant to section 2903.02 UF of the Ohio Revised Code. (Cmplt. Ex. 6). The Indictment provides no factual allegations whatsoever, except to state the date of each separate event, the name of the Mount Carmel patient who died in the hospital, and that the Grand Jury found that Dr. Husel "did purposely cause the death" of the patient. The Indictment attributes no motive to Dr. Husel.  Since the estates of each of the 25 individuals named as victims in the Indictment have filed civil complaints against Dr. Husel, the hospital, the attending nurse and the pharmacist, Dr. Husel understands that the Indictment relates to his prescriptions for pain medication while he provided palliative care.  The Franklin County prosecutor has publicly confirmed the same.

### *July 2019 – Dr. Husel's Criminal Counsel Presents Claim to TAL and THC for Coverage of Defense Fees and Costs. TAL and THC Deny Coverage and Refuse to Defend Dr. Husel and Issue Written Explanation Contradicted by Previous Reservation of Rights on Civil Claims and Unsupported by the Plain Language of the Policy*

On July 8, 2019, counsel for Dr. Husel that he hired to defend him in the criminal case demanded coverage under the four relevant insurance policies.  That day, Mount Carmel and Trinity Health informed Dr. Husel that the demand had been forwarded to the Insurer.  (Cmplt. Ex. 11). On August 5, 2019, TAL sent Trinity Health a Second Supplemental Reservation of Rights letter to account for now 30 civil cases that had been filed against Dr. Husel.  This letter was identical in all material respects to the prior letters, and concluded that while it would reserve its rights to deny coverage, TAL would continue to indemnify Trinity Health for its Defense Expenses that it was paying to Dr. Husel's *civil* counsel, as the veracity of the factual allegations had not yet been determined. The letter specifically reserved its rights to deny coverage "[i]f after further investigation of the Civil Claims it is determined that Dr. Husel was not acting within the scope of his duties as an employee of a TAL Insured. . ." (Cmplt. Ex. 12). As a result, Trinity Health notified Dr. Husel that "…Trinity will continue to provide you a defense for the Civil Claims…." (*Id*.)

On the same day that TAL issued a (third) reservation of rights letter *agreeing to indemnify* Trinity Health and advance Dr. Husel's Defense Expenses in defending thirty civil claims, TAL issued a letter *denying* coverage for all Defense Expenses associated with defending the criminal indictment – notwithstanding the allegations in each being identical. (Cmplt. Ex. 13). The August 5 letter denying coverage set forth six reasons for denying coverage.  Among them, TAL denied coverage on the basis that Dr. Husel was "acting outside his scope of employment" when he prescribed pain relief medication to Mount Carmel Patients, notwithstanding their taking the opposite view in connection with the civil cases (where the hospital and others are also defendants) as stated in their other letter, dated the same day.

Similarly, while the Reservation of Rights letters relating to coverage in the civil matter all conclude that the "veracity of the facts of the [New] Claims" ***could not be determined*** and

that coverage was available, in the denial letter, TAL assumed that the veracity of allegations could be presumed as a basis to withhold coverage. TAL also denied coverage by referencing exclusions relating to inapplicable provisions in the Policies (under which no claim was made) but ignoring the applicable policy provisions that plainly **do** compel coverage of Defense Expenses and place the Indictment within the insurer's duty to defend. Among the several reasons for denying Dr. Husel's entitlement to defense, was claiming that the indictments do not qualify as a "loss" even though "Loss" is not required for coverage, only a "Loss Event" (which did occur) is.

TAL also denied coverage, claiming that Dr. Husel's alleged over-prescribed fentanyl to 25 patients on 25 separate occasions over the course of three years did not constitute an "Event" under the Policies. Even assuming they are not an "Event," only a "Medical Incident" (which is certainly alleged) is needed to invoke the duty to defend. TAL also denied coverage on the basis that the Indictments do not give rise to a payment obligation to any third party as the result of a claim. But beyond being an irrelevant statement (no such claim is required), the Indictment *does* seek payment to a third-party: The state.

***Description of the Polices***[4]

The Primary Policy provides for "Defense Expenses" in Part I entitled Healthcare Professional Liability and Managed Care Liability Coverage. Specifically, the policy provides "[TAL] will also indemnify [Trinity Health] for Defense Expenses incurred in connection with a claim arising from Healthcare Professional Liability or Managed Care Liability covered under

---

[4] As an employee (during the relevant time frame), Dr. Husel is an "Insured" under four policies: (1) Integrated Risk Liability Policy, Policy No. V-18/19-INTPR-1001 (the "Primary Policy"); (2) Follow Form Buffer Layer Liability Policy, Policy Nov-19/19-HP-BUF (the "Buffer Policy"); (3) Excess Integrated Risk Liability Policy, Policy No. VXSR-18/19-1 (the "Excess Policy"); and (4) Follow Form High Excess Layer Policy, Policy No. V-XSPLG-18/19 (the High Excess Policy"), in effect from July 1, 2018 to July 1, 2019 (collectively, the "Policies"). Dr. Husel was covered by different policies for the Medical Incidents forming the basis of the allegations during 2015, 2016, and 2017. Dr. Husel does not have copies of these policies and argues, on information and belief, that the policies for earlier years are identical in all material respects to the Policies for July 1, 2018 – July 1, 2019.

this Policy, even if any of the allegations of the claim are groundless, false, or fraudulent."
(Cmplt. Ex. 2). While it is TAL that must indemnify Trinity Health for Defense Expenses, it is
Trinity Health that has the duty to defend all claims covered by the policy. (*Id.*, Part VIII:
Conditions: Defense Duty "[TAL] has no duty to defend any claim. [Trinity Health] has the duty
to defend all claims that are covered by this policy.")

Relevant for this matter, the Primary Policy defines "Healthcare Professional Liability"
as any liability arising out of a "Medical Incident." A Medical Incident means any act, error or
omission in the furnishing of or failure to furnish "Medical Services." Medical Services includes
"medical, surgical. . . nursing. . . or care to any person, including (a) the furnishing of
medications, drugs . . . or applications in connection therewith. A Medical Incident also includes
"any Loss Event. . . that results in injury to any one Patient or any number of **Patients**." "Loss
Event" means as respects Part I, Healthcare Professional Liability: A Medical Incident.

The Primary Policy defines who is covered in Part VI (Definitions) and covers Dr. Husel
as "[a]n Employee of a Named Insured, including without limitation any physician, resident, or
fellow who is an Employee, but while within the scope of his/her duties as such."  Defendants do
not dispute Dr. Husel was an employee and is an Insured under the Policies. "Defense Expenses"
means "those amounts incurred in the investigation, adjustment, defense, settlement, or
adjudication of any claim brought against an Insured that is covered under this Policy.  Defense
Expenses include "(1) legal expenses, attorney's fees, and court costs. . . [.]"

The Buffer Policy, Excess Policy, and High Excess Policies are "follow-form" policies
that "appl[y] in conformance with, and [are] subject to the same terms, insuring agreements,
exclusions, conditions, definitions, endorsements and other provisions that apply to Group I
Health Care Professional Liability, […], of the Followed Policy [(the Excess Policy)]."  (Cmplt.
Exs. 3, 4 and 5). Significantly, each of the follow-form policies provide that "[i]f any of the

terms or provisions applicable to Group I, Health Care Professional Liability […] of the Followed Policy are inconsistent with the terms and provisions of this policy, the terms and provisions of this [follow-form] policy will control."

The High Excess Policy provides two relevant exclusions.  Exclusion H applies "[t]o any liability arising out of dishonest, fraudulent, malicious or criminal acts committed by the Insured. However, for the purpose of determining the applicability of this exclusion [] this exclusion will apply only if it is determined by final adjudication that the Insured committed such an act. (Cmplt. Ex. 5); and I, which provides for "[] any liability arising out of the willful violation of any law, statute, regulation or ordinance committed by the Insured.  However, for purposes of determining the applicability of this exclusion [] this exclusion will apply only if it is determined by final adjudication that the Insured committed such an act. (*Id.*).  So the follow form excess policies make clear that claims made against the policy based on criminal allegations will be excluded, but such exclusion only applies *after* a final adjudication. The exclusion does not apply prior to a final adjudication of the allegations – a standard provision in professional liability policies.

## **ARGUMENT**

To obtain a preliminary injunction, a movant must show: (1) the likelihood of success on the merits; (2) imminent and irreparable harm absent the granting of the injunction; and (3) that the balance of the equities is in the movant's favor, including public interest considerations. *Cincinnati Insurance Co. v. Zen Design Group, Ltd. 329 F.3d 546*, 552 (6th Cir. 2003).

## I.     **Dr. Husel is Likely to Establish THC's and TAL's Duty to Defend**

The interpretation of an insurance policy is a matter of law for the court and the question of whether a duty to defend exists is appropriate for expedited decision for a declaratory judgment seeking a preliminary injunction. Courts construe an insurer's duty to defend more

broadly than its duty to indemnify.[5] *Cincinnati Insurance Co. at* 552. An insurer's duty to defend extends even to non-meritorious claims where those claims allege theories of recovery that arguably or potentially fall within the policy. *Id.* (citing *Am. Bumper Mfg. Co. v. Hartford Ins. Co.,* 207 Mich.App 60 (1994); see also *Sherwin-Williams Co. v. Certain Underwriters at Lloyd's London*, 813 F.Supp.576, 583 (N.D. OH 1993). The Supreme Court of Ohio explained in *Willoughby Hills v. Cincinnati Ins. Co.*, "Where the insurer's duty to defend is not apparent from the pleadings in the action against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim." See also, *Westfield Ins. Co. v. Health Ohio, Inc.,* 73 Ohio App. 3d 341, 344 (1992), *Advance Watch*, 99 F.3d at 799 (the duty to defend is so broad that it obligates an insurer to defend a claim if it "arguably falls within the language of the policy"). Critically, a duty to defend arises "if the pleading against the insured contains allegations which are vague, nebulous, or incomplete such that a potential for coverage exists." *Id*. Importantly, where only some of the claims against the insured are covered, the insurer must defend the whole claim until it becomes apparent that no recovery is possible under the covered theory." *Cincinnati Insurance Co. at* 552.

It is universally accepted that the interpretation of insurance policies is governed by the same principles used to interpret ordinary contracts, and that insurance policies must be read as a whole with meaning given to all of their terms. See generally, *Cincinnati Insurance*, at 553. A contract provision that is clear and unambiguous must be "taken and understood in [its] plain, ordinary, and popular sense." *Id.* Any such unambiguous terms are not subject to interpretation

---

[5] The insurance policies do not provide for any choice of law and this case involves an Ohio Plaintiff against a Michigan Company and its wholly-owned Captive Insurance Company which the Michigan Company incorporated in the Cayman Islands. Whether this court applies Michigan or Ohio law will not change any analysis. This brief relies largely on Ohio law.

and must be enforced as written.  In contrast, contract provisions are considered ambiguous when "the terms are reasonably and fairly susceptible to multiple understandings and meanings." And of course, all ambiguities must be interpreted in a light most favorable to the insured.  *Id*.

> ### A. When Insurance Policies Intend to Exclude Covering Defense Expenses for Criminal Indictments They State So Explicitly – the Policies Here Do Not

The denial letter is, at its core, an attempt to use provisions that were not drafted to exclude criminal cases from the duty to defend, to imply such an exclusion. The problem with this argument is that for the Policies to exclude such a duty, Sixth Circuit law required the Policies to have explicitly and unambiguously excluded such coverage: they did not.  Indeed, the language suggests quite the opposite. The Primary Policy provides that it will cover Defense Expenses for "a claim arising from Healthcare Professional Liability. . . even if the claim is groundless, false or fraudulent." (Cmplt Ex. 2).  The policy does not define "claim" at all, let alone define it as only referring to civil causes of action. Moreover, the follow-form policy explicitly asserts that TAL *will* cover losses from allegations arising out of the "willful violation of any law, statute, regulation or ordinance committed by the Insured" until it "determined by final adjudication that the Insured committed such an act." (Cmplt Ex. 5).  This is standard for Insurance Policies, and courts confronted with a Policy that includes such language rule that the Insurer has a duty to advance Defense Expenses.  This case is no different.

As District Judge Harmon noted in the insurance coverage dispute arising out of the collapse of Enron and subsequent criminal charges, "The Court's research has revealed that in cases addressing liability insurance policies' coverage of Defense Expenses, the language of the policies standardly and explicitly states whether coverage is for civil and/or criminal costs." *In re Enron Corporation Securities*, 391 F.Supp.2d 541 (S.D. Tx.2005). But in *Enron*, as here, the insurance policy failed to use the words "civil" or "criminal" in providing that it will pay

Defense Expenses.  As the judge in *Enron* found, "an attempt to exclude coverage must be expressed in clear and unambiguous language." *Id*. Since the Insurer failed to unambiguously provide in the Policy that it would not cover Defense Expenses for criminal indictments, the court easily interpreted the contract to not exclude such advancement. *Id.*

Judge Harmon surveyed the field and reviewed the law from across the Circuits and found that insurers are universally required to advance legal fees until criminal proceedings are concluded and a final adjudication made unless the policy expressly provides that Defense Expenses for criminal indictments are not covered. *Id*. at pg. 573-747 (collecting cases across District and Circuit Courts).  Judge Harmon held that:

> If courts allowed absolute discretion to the insurer to withhold payment whenever charges of intentional dishonesty [or wrongful conduct] are leveled against [the insured] then insurers would be able to withhold payment in virtually every case. That would be a most unsatisfactory result.  It would leave [insureds] in an extremely vulnerable position.  Any allegations of dishonesty, no matter how groundless, could bring financial ruin upon an [insured].

*Id*.  After reviewing the Policy in that case, which (as is the case here) made "no civil/criminal distinction in the definition of "Defense Costs" but rather included language that refers to "all expenses incurred. . . in the defense of any claim" (also identical to the language here), the Court concluded that "both criminal and civil acts can fall within the reach of the definition." Consequently, the Court concluded that the majority view, requiring payment of defense expenses in defending a criminal indictment up to a final adjudication "is the better rule." *Id*.

**B.    The Plain Language of the Policies Establishes the Duty to Defend by Advancing Defense Expenses to Dr. Husel for not just the Civil Lawsuits as Already Agreed but the Criminal Indictment too**

As a benefit and condition of Dr. Husel's employment with Mount Carmel he was guaranteed "professional liability coverage for all activities conducted in the course of employment."  Mount Carmel satisfied this condition and obtained broad liability coverage

17

through its parent company Trinity Health and its captive insurance company Trinity Assurance

for Dr. Husel, which would cover defense expenses incurred by Dr. Husel in defending against

civil and criminal liability for "any act, error or omission in the furnishing of or failure to furnish

medical services." (Cmplt. Ex. 1, Part VI(V)).

      As described above, the Primary Policy provides coverage for defense expenses in the

criminal action because Part I of the Primary Policy provides coverage for certain "Loss Events,"

resulting from "any act, error or omission in the furnishing of or failure to furnish Medical

Services" which includes the prescription of pain medication.  Accordingly, the Primary Policy

provides coverage for Defense Expenses for any "liability" that Dr. Husel may incur as a result

of any alleged act, error or omission in the furnishing of medical services – exactly the

allegations in both the civil lawsuits and the criminal indictment.

      While the Primary Policy does not define "liability," as discussed above, "interpretation

of insurance contracts is a matter of law for the Court," such that "a court construing insurance

policies must enforce the contract as written and give the words their plain and ordinary

meaning" and "any ambiguities in insurance policies" must be "interpreted against the insurer

and in favor of the insured."  *Medpace, Inc. v. Darwin Select Ins. Co.*, 13 F. Supp. 3d 839, 843–

44 (S.D. Ohio 2014).  "Similarly, "[u]nder black letter Ohio law, an undefined exclusionary term

must be narrowly construed against the insurer."  *Id.*

      The word "liability" is understood to include both criminal and civil liability. *See, e.g.*,

Ohio Rev. Code § 2901.21 (titled "Requirements for criminal liability," and setting forth conduct

necessary of a "person's liability" for crime); Ohio Rev. Code § 2901.23 (titled "Organizational

criminal liability" and setting forth the purpose of imposing "organizational liability" under the

criminal code).  This common understanding and usage comport with Black's Law Dictionary,

which defines liability as "[t]he quality, state, or condition of being legally obligated or

accountable." *See United of Omaha Life Ins. Co. v. Kay*, 751 Fed. Appx. 636, 639 (6th Cir. 2018) (*quoting* BLACK'S LAW DICTIONARY 1053 (10th Ed. 2014)).

This common understanding and usage also comport with language *in the Policies themselves*, which define liability to include both criminal liability and civil liability.  (Cmplt Ex. 5, Part VII(H)–(I)). Specifically, the Excess Policy creates exclusions for "***any liability*** arising out of dishonest, fraudulent, malicious or criminal acts committed by the Insured" and (2) "***any liability*** arising out of the willful violation of any law, statute, regulation or ordinance committed by the Insured." (Cmplt Ex. 5, Part VII(H)–(I)) (emphasis added).  Any means any.  This includes both civil and criminal liabilities. Respectfully, this court is not permitted to interpret the insurance policy in such a way that "any" means "only civil" and unambiguously "not criminal".

Obviously, the Insurer understood liabilities could be "criminal" because the Excess Policy provides an exclusion for "criminal liabilities" but "only after a final adjudication."  Such exclusions are not uncommon in insurance contracts, and confirm the intention of the parties here to cover "liability arising out of" alleged "criminal acts" unless it has been determined by final adjudication that the alleged act was committed. *See State Auto. Mut. Ins. Co. v. Security Taxicab, Inc.*, 144 Fed. Appx. 512, 519 (6th Cir. 2005).  If TAL's assertion that the duty to defend is limited to civil actions were accepted, then the limited exclusions in the Excess Policy regarding "criminal acts" would be rendered meaningless surplusage. But courts may not ignore this language as "mere surplusage *if* the court can discover any reasonable purpose thereof which can be gathered from the whole instrument." *Leonor v. Provident Life and Acc. Co.*, 18 F. Supp. 3d 863, 872 (E.D. Mich. 2014) (emphasis added); *see also Affiliated FM Ins. Co. v. Owens-Corning Fiberglass Corp.*, 16 F.3d 684, 686 (6th Cir. 1994) ("In construing a contract, a court not only must give meaning to every paragraph, clause, phrase and word, omitting nothing as

19

meaningless, or surplusage."). Here the language *has* meaning so long as there is no implied limitation to the duty to defend limiting it to civil claims.  Given the policy terms, Trinity Health and Trinity Assurance must cover Dr. Husel's defense expenses incurred in defending against criminal liability.

### C.   Plaintiff Can Easily Show Irreparable Harm if His Contractual Right to a Paid Defense Is Violated

Dr. Husel is accused of intentionally murdering 25 ICU patients – minutes before their otherwise natural death, and after their surrogates decided to withdraw life support – and doing so by writing a prescription that was reviewed and approved by a pharmacist, properly entered into the hospital's database which included warnings to alert for improper prescriptions, and then administered by nurses.  It is clear that he is actually innocent of any wrongdoing, and in any event plainly has a meritorious defense as to each and every count in the Indictment.  And given the penalties associated with even one count of murder, the harm that would be inflicted by the loss of funds owed to him to mount the defense, as he and his chosen counsel see fit, is enormous.   Ohio Law provides for immunity from prosecution for the good faith administering of pain medication to patients as they are dying and the Supreme Court has asserted that physicians must be shielded from prosecution even if there is a "double-effect" of a pain medication that hastens death while alleviating pain and suffering. Dr. Husel is relying on TAL's obligation to advance his Defense Expenses to fund his legal defense and prove that he acted in good faith, and is innocent.  The preliminary injunction sought here protects Dr. Husel's right to Defense Expenses and is thus crucial to Dr. Husel's defense and his liberty. If Trinity Health is not compelled to advance Dr. Husel his Defense Expenses, Dr. Husel will not have adequate funds to defend himself against false and groundless allegations. This is not what Dr. Husel bargained for when he signed his employment contract that provided Trinity Health would

purchase insurance on his behalf (which it did) to defend him against all claims, even those that are "groundless, false, and fraudulent."  If Trinity Health and TAL withhold these Defense Expenses, his contract right will be irretrievably lost, and his defense will suffer irreparably. Indeed, because he does not personally have funds to launch an appropriate defense to the allegations against him it is not an exaggeration to say that if he not granted the relief sought here – to which he is contractually entitled – he may face conviction solely as a result of having not been provided Defense Expenses he was guaranteed as part of his employment contract. This is the epitome of irreparable harm.

**D.    The Equities Balance in Favor of Enforcing Trinity Health and TAL to Defend Dr. Husel by Advancing His Defense Expenses by Preliminary Injunction**

A party seeking a preliminary injunction must show that the balance of equities tip in its favor. Here, there is no doubt that the equities tip overwhelmingly in favor of Dr. Husel – and decidedly so.  In the absence of an order directing TAL to comply with its obligation to advance Defense Expenses, the Insureds' defense of serious criminal charges that puts his liberty at stake would be irreparably hampered.  In the starkest possible contrast, the only possible harm or inconvenience to TAL is economic.  A harm involving basic constitutional rights to the counsel of his choice using funds that he is contractually entitled to clearly outweighs purely economic consequences asserted by the insurance company.  *See, e.g., Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

## II.     None of THC and TAL's Reasons for Denial Defeat the Obligation to Defend

### A.     Allegations of Intentional Misconduct that, if Proven, Would not Qualify for Coverage Must Still Be Defended Until There Has Been a Final Adjudication of the Conduct as set Forth in the Excess Policy, Which Is Precisely the Position TAL and TAC Took in Their Reservation of Rights Letter Covering Defense Expenses Related to the Civil Cases

Three of the six pretexts for denial of coverage hinge on the assertion that Dr. Husel has been charged with "purposeful murder." For example, TAL asserts that "purposeful murder" is outside the scope of Dr. Husel's duties as an employee of Mount Carmel and therefore, there is no coverage available. TAL further asserts that [t]he Indictments do not arise out of "Healthcare Professional Liability" because the term "Medical Services" "does *not* include 'purposeful murder.'" (Ex. 13, pg. 13). Of course, no insurance company would be compelled to pay damages or losses if Dr. Husel actually engaged in "purposeful murder." But he hasn't. He has been accused of this, but false and groundless allegations do not remove the duty to defend. Moreover, his actual conduct at issue – prescribing medication to patients in the course of his employment with the intention of providing palliative care – is not only within Dr. Husel's duties, it was one of his primary duties. In other words, TAL bases its denial on the groundless premise that the allegation that Dr. Husel's intention was to cause death as opposed to alleviate pain removes the claim from the scope of his duties, because if he had intended to cause death, then his actions would not have been within his duties. This argument is absurd.

As discussed more fully above, the definition of "Medical Services" renders the conclusion that Dr. Husel's Defense Expenses are covered here unavoidable because he is charged with "hastening" death by prescribing medications in connection with comfort care to end of life patients. That is, Dr. Husel *was* providing Medical Services, and the Indictment seeks to impose criminal liability for the act of doing so. It is difficult to image allegations that fit more squarely within the definition of coverage under the Policies.

**B.     The Exclusions Cited by TAL in its Denial Letter Are Inapplicable as They Fail to Clearly and Unambiguously Exclude Defense Expenses for Defending a Criminal Indictment.**

The other three pretexts that TAL puts forth to attempt to exclude Defense Expenses incurred in defending the criminal indictment are asserted by arguing that ambiguous language in the policies must mean that claims stemming from criminal allegations are not covered.  But these pretexts are just reruns of the primary argument that only claims for advancement in defending civil suits are covered.  For example, TAL argues that the term "claims" should be interpreted to mean only "civil claims" and that coverage is excluded because the criminal indictment alleges claims based on "the knowing, willful, violation of a penal statute committed by or with the knowledge of the Insured."  But this exclusion is not intended to exclude the payment of Defense Expenses in defending against allegations of a willful violation of a penal statute.  If that were the case, the policy would be useless.  This exclusion is intended to prevent Trinity Health from seeking indemnification for Defense Expenses *after a finding of willful violation of a penal statute*.  Indeed, this is why the follow on Excess Policy provides that the exclusion applies "only if it is determined by final adjudication that the Insured committed such an act." If the exclusion applied at the moment of allegation, there would be no need for the exclusion at the Excess level to only apply after final determination.

Finally, the August 5 letter also denied coverage on the basis that the criminal indictment seeks "non-pecuniary relief" which the insurer claims is intended to exclude from coverage Defense Expenses for criminal indictments.  But again, if the policy was intended to do that, it would have said so explicitly.  This provision is intended to exclude claims made by Trinity Health against TAL seeking non-pecuniary relief. *Westfield Ins. Co. v. HealthOhio, Inc.* illustrates the purpose of this exclusion.  73 Ohio App. 3d 341, 345–46 (1992). The *Westfield* court held that Westfield's insurance policy committed the insurer to defend "suits" seeking

damages, which did not include "suits" seeking *only* injunctive relief. Even if the Court were to interpret this provision as applying to all claims seeking non-pecuniary relief, as a factual matter that would be insufficient to exclude Defense Expenses here because the Indictment seeks pecuniary relief in the form of fines of $15,000 for each of the 25 counts.

### III.  Having Taken Demonstrably Adverse Actions Towards Dr. Husel, Including Violating the Duty to Defend, Defendants May No Longer Exercise any Purported Right to Select Dr. Husel's Counsel

Part VIII of the Primary Policy provides that "the authority to select and direct defense counsel to any settlement shall be vested solely with [a Department within Trinity Health] and not with any insured."  While this provision is ambiguous, one reading might be that only Trinity Health has authority to select Defense Counsel on behalf of all Insureds – even for a criminal case. But this would necessarily violate the Sixth Amendment which guarantees a criminal defendant with the counsel of *his choice*, not his employer's choice. See *Louis v. United States*, 578 U.S. __, (2016). But even if this ambiguous provision is interpreted to have granted Trinity Health the ability to select Dr. Husel's criminal counsel, any such right has now been forfeited. By its actions, including denying its duty to defend him, as well as taking positions directly contrary to Dr. Husel's interest such as notifying patients and the prosecutor's office that it believes his conduct hastened the death of 26 patients, THC has lost any right it might have once had to select Dr. Husel's counsel in his criminal defense. Moreover, Dr. Husel's counsel has been working full time on his defense since being hired several weeks ago. With trial scheduled in just several months, it would be devastating to Dr. Husel's defense to be compelled to accept different counsel who would have to start learning the case from scratch, and whom does not have a personal relationship with Dr. Husel.

The law supports this outcome as well. Ohio law states that "[a]n insured is entitled to counsel of its choosing . . . in those situations where it is impossible for the carrier to represent

the insured's interests." *Lusk v. Imperial Cas. & Indemnity Co., 605 N.E.2d 420, 423* (Ohio Ct. App. 1992). Such is the case here. In addition to Defendants' August 5 letter to Dr. Husel denying their obligation to provide him with defense counsel, Defendants made it abundantly clear long before that they would not protect his interests. In fact, Mount Carmel and its parent Trinity Health actively took steps directly *against* Dr. Husel's interests, making their "interests . . . 'mutually exclusive' such that [Trinity Heath is] unable to provide a defense on all claims." *Red Head Brass, Inc. v. Buckeye Union Ins. Co., 735 N.E.2d 48,* 55 (Ohio App. Ct. 1999). Their directly-adverse conduct included firing Dr. Husel, and notifying family members of patients, the State Medical Board of Ohio, and the Franklin County Prosecutor that Dr. Husel was responsible for hastening the death of patients by administering excessive and lethal doses of fentanyl to patients after their families had removed them from life support, even though they had no evidence that he intended to hasten their death as opposed to alleviate their suffering. (And failing to recognize the absolute immunity from adverse employment actions, civil liability or criminal prosecution from a "double-effect" prescription which both alleviates pain but might also hasten death). Based on its own affirmative actions, Mount Carmel's parent Trinity Health cannot by any stretch assert that it has the ability to defend both its own interests as well as Dr. Husel's.

## CONCLUSION

While Dr. Husel's innocence is obvious and certain to be proven at trial (at great expense), the question of his guilt or innocence is of no moment to this Court, the only question is whether the insurance policies that cover him – and are mandated by his employment contract – require Trinity Health Corporation to defend, and the insurance company to indemnify, him. The plain language in the policy makes the answer clear, there is such a duty to defend.

For the foregoing reasons, the Court should grant Plaintiff's motion for a preliminary injunction declaring that Defendants must advance all Defense Expenses to Dr. Husel so that he may properly defend himself in the criminal action.

Dated: August 26, 2019

Respectfully submitted,

_____

FORD O'BRIEN LLP
Adam C. Ford
575 Fifth Avenue
17th Floor
New York, NY 10017
(212) 858-0040
aford@fordobrien.com


*Attorneys for Plaintiff Dr. William S. Husel*